## In re TERAZOSIN HYDROCHLORIDE ANTITRUST LITIGATION

### No. 99MDL1317.

United States District Court,
S.D. Florida,
Southern Division.

Dec. 13, 2000.

See, also, 2001 WL 1002711.

Mitchell Wayne Berger, Jeffrey Scott, Wertman, Candice Diane Tobin, Berger Singerman, Fort Lauderdale, FL, Daniel L. Berger, David Sorensen, Eric L. Cramer, Berger & Montague, P.C., Philadelphia, PA, David Boies, Boies Schiller & Flexner, Armonk, NY, Joseph C. Kohn, Kohn Swift & Graf, Philadelphia, PA, Jack Staph, Jack Staph & Associates, Pepper Pike, OH, Richard Drubel, Boies Schiller & Flexner, Hanover, NH, for Valley Drug Co.

Robert Scott Palmer, C. Oliver Burt, III, Berman DeValerio Pease Tabacco,

West Palm Beach, FL, Barry S. Taus, Barry S. Taus, Bruce E. Gerstein, Stephen H. Schwartz, Garwin, Bronzaft, Gerstein & Fisher, L.L.P., New York, NY, Aubrey B. Calvin, Mark S. Armstrong, Calvin Richardson Verner, Armstrong and Camp, Houston, TX, David P. Smith, Percy Smith Foote & Gadel, Alexandria, LA, John Gregory Odom, Stuart E. Des Roches, Randall Acree, Odom & Des Roches, New Orleans, LA, for Louisiana Wholesale Drug Co., Inc.

Scott E. Perwin, Kenny Nachwalter Seymour Arnold Critchlow & Spector, P.A., Miami, FL, Douglas E. Patton, Dewsnup King & Olsen, Salt Lake City, UT, for Walgreen Co., Inc.

Mary Boies, Boies & McInnes, Bedford, NY, for Drug Mart Pharmacy Corp.

Herman Joseph Russomanno, Robert John Borello, Russomano & Borello, Miami, FL, Pamela B. Slate, Donaldson Guin & Slate, Birmingham, AL, for Blue Cross and Blue Shield of Alabama.

Gary Robert Fine, Fort Lauderdale, FL, Joseph Arshawsky, Provost Umphrey Youngdahl & Sadin, Albuquerque, NM, for Arkansas Carpenters Health and Welfare Fund.

Steve D. Shadowen, Schnader Harrison Segal & Lewis, LLP, Harrisburg, PA, for Rite Aid Corp.

Michael D. Hausfeld, Cohen Milstein Hausfeld & Toll, Washington, DC, for Clarence E. Reid, Albert J. Meyer, Lloyd Latona, Samuel Lloyd, Antonio Lopez–Souto.

Robert C. Schubert, Juden Justice Reed, William F. Jonckheer, Schubert & Reed, San Francisco, CA, Geoffrey L. Taylor, Rawlings & Associates, Westlake Village, CA, for Maxicare Health Plans, Inc.

Elwood S. Simon, John Zuccarini, Elwood S. Simon & Associates, Birmingham, MI, for Martin Bernstein.

David Scott Mandel, Mandel & McAliley, Miami, FL, Jason L. Solotaroff, Stamell & Schager, New York City, for Char–Mar Pharmacy, Inc.

Daniel Small, Cohen Milstein Hausfeld & Toll, Washington, DC, Stephen Lowey, Lowey Dannenberg Bemporad & Selinger, White Plains, NY, for Indirect Purchaser.

Paul Alan Shelowitz, Akerman Senterfitt & Eidson, Miami, FL, Robert Alexander Milne, Wayne A. Cross, Michelle Wilhelm, Paul Olszowka, Joseph Angland, Dewey Ballantine, New York City, Martha Jennet Talley, Dewey Ballantine, Washington, DC, Elizabeth J. Basten, Detroit, MI, for Geneva Pharmaceuticals, Inc.

Jay Brian Shapiro, Stearns Weaver Miller Weissler, Alhadeff & Sitterson, Miami, FL, Gerson A. Zweifach, Kevin M. Downey, Kirsten M. Schimpff, Kathleen L. Jennings, Manish K. Mital, Williams & Connolly, Washington, DC, for Ivax Pharmaceuticals, Inc.

Jon W. Zeder, Adorno & Zeder, Miami, FL, Kevin Clark Maclay, Jones Day Reavis & Pogue, Washington, DC, Stephen E. Morrissey, Jeffrey I, Weinberger, Stuart N. Senator, Munger Tolles & Olson, Los Angeles, CA, Andrew J. McGuinness, Dykema Gossett, Ann Arbor, MI, for Abbott Laboratories.

Stephen E. Morrissey, Jeffrey I. Weinberger, Stuart N, Senator, Munger Tolles & Olson, Los Angeles, CA, for Abbott Laboratories, Inc.

### *ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT ZENITH'S MOTION FOR SUMMARY JUDGMENT*

SEITZ, District Judge.

After defendant Zenith Goldline Pharmaceuticals, Inc. ["Zenith"] moved for

summary judgment on the plaintiffs' federal antitrust complaints [D.E. No. 77, Civ. No. 98–3125; D.E. No. 45, Civ. No. 99–1938], the Sherman Act Plaintiffs [1] sought a partial summary judgment [D.E. No. 21, Civ. No. 99–MDL–1317] that defendant Abbott Laboratories ["Abbott"] contracted with defendants Zenith and Geneva Pharmaceuticals, Inc. ["Geneva"], to secure the entire domestic market for prescription drugs containing terazosin hydrochloride in violation of section one of the Sherman Antitrust Act, 15 U.S.C. § 1. The undisputed facts in this case demonstrate that Abbott's agreements with its horizontal competitors would tend to impair domestic competition and restrain the trade of terazosin hydrochloride products. American courts have long condemned such agreements as illegal *per se* under the Sherman Act. Accordingly, the Court will grant the requested partial summary judgment to the plaintiffs, deny defendant Zenith's motion for summary judgment without prejudice, and allow the parties to conduct full discovery on the issues of causation and damages.

## BACKGROUND

### 1. Stirrings of a Competitive Market for Terazosin Hydrochloride

Abbott developed terazosin hydrochloride for the treatment of hypertension and enlarged prostate and sought the Food and Drug Administration's ["FDA"] approval to market the drug by filing a New Drug Application ["NDA"]. Pursuant to the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–91 ["FDCA"], FDA examined terazosin hydrochloride's safety and efficacy and approved it for human consumption, publishing three of Abbott's claimed patents in the publication, "Approved Drug Products with Therapeutic Equivalence Evaluations," affectionately known as the "Orange Book."

In 1987, Abbott began exclusively marketing terazosin hydrochloride under the trademark "Hytrin" in tablet and capsule forms. Hytrin has been lucrative for Abbott. According to the Federal Trade Commission, Hytrin generated $540 million in sales in 1998, accounting for more than twenty percent of Abbott's net sales of pharmaceutical products in the United States.[2]

Beginning in 1990, generic drug maker Geneva took steps to compete with Abbott by developing a generic terazosin hydrochloride drug that could contain different inactive ingredients and be sold without a brand name in tablet and capsule forms. Taking advantage of the "Hatch–Waxman Amendments" to FDCA that streamlined the evaluation process for proposed generic drugs,[3] Geneva applied for FDA approval by submitting four Abbreviated New Drug Applications ["ANDAs"] between 1993 and 1996. Geneva's ANDAs relied on

---

1. The term "Sherman Act Plaintiffs" refers to all plaintiffs who allege violations of the Sherman Antitrust Act in the individual and class cases consolidated before the Court.

2. (*See Compl., Abbott Labs.*, No. C–3945, at ¶ 10 (FTC May 22, 2000), *available at* http://www.ftc.gov/os/2000/05/abbottgeneva-comp.htm *and reprinted in* Zenith Notice, Ex. B, Civ. No. 99–MDL–1317, Mar. 20, 2000); *see also* Federal Trade Commission, Analysis to Aid Public Comment (2000), *available at* http://www.ftc.gov/os/2000/05/abbottgene-vaanalysis.htm ["ANALYSIS"]. The Federal Trade Commission recently concluded an investigation into the Abbott–Geneva accord by entering a consent decree prohibiting similar accords. *See* Analysis ¶ 21. That decree does not govern the Court's decision.

3. Drug Price Competition & Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355). The declared purpose of this legislation was to "make available more low cost generic drugs." H.R. Rep. No. 98–857, pt. 1, at 14 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647.

data concerning Hytrin's safety and efficacy, asserted that the proposed generic drug was "bioequivalent" to Hytrin, and certified under paragraph IV of 21 U.S.C. § 355(j)(2)(A)(vii) that the proposed drug did not infringe any *valid* patent claimed by Abbott for Hytrin.

When Abbott received notice of Geneva's "paragraph IV certifications" challenging its patents, it exercised its statutory right to sue Geneva within forty-five days for patent infringement under 21 U.S.C. § 355(j)(5)(B)(iii) by instituting several actions in the United States District Court for the Northern District of Illinois. By statute, these suits effectively prevented FDA from approving Geneva's disputed ANDAs for 30 months unless Abbott's Hytrin patents were declared "invalid or not infringed." *Id.* § 355(j)(5)(B)(iii)(I).

The Hatch–Waxman Amendments to FDCA furnished a significant incentive for Geneva to raise the first challenge to Abbott's Hytrin patents, namely, exclusive marketing rights to the first generic version of Hytrin for 180 days. *Id.* § 355(j)(5)(B)(iv). Under the "successful defense" regulation that FDA promulgated to implement this statutory incentive, however, Geneva needed to obtain a final decision of non-infringement from either the trial court or the Court of Appeals for the Federal Circuit in order to perfect its entitlement to the 180–day exclusive marketing period. *See* Abbreviated New Drug Application Regs., 54 Fed.Reg. 28,872, 28,-894 (July 10, 1989); Abbreviated New Drug Application Regs., Patent and Exclusivity Provisions, 59 Fed.Reg. 50,338, 50,-350–55 (Oct. 3, 1994). If another generic drug maker, such as Zenith, challenged Abbott's patents and successfully defended its ANDA first, Geneva would not be entitled to this statutory incentive. Zenith would be able to market the first generic terazosin hydrochloride drug, albeit without exclusive marketing rights to delay its

competitors from entering the marketplace.

In June, 1994, Zenith joined the race to bring the first generic terazosin hydrochloride drug to market by filing an ANDA featuring a paragraph IV certification on one of Abbott's Hytrin patents. (Zenith Mem., Oct. 22, 1999, Ex. 6, at 11.) Abbott brought two unsuccessful infringement suits against Zenith for infringement of this patent, which was not timely included in the Orange Book. *See Abbott Labs. v. Zenith Labs., Inc.*, 934 F.Supp. 925, 939 (N.D.Ill.1995) (dismissing case and observing that Abbott retained right to sue Zenith for patent infringement "upon the commencement of marketing ... of the generic copy"). Abbott then submitted two additional patents to FDA for inclusion in the Orange Book, U.S. Patents 5,412,095 ["'095 patent"] and 5,504,207 ["'207 patent"]. In March, 1996, FDA informed Zenith that it would have to amend its ANDA to certify with respect to those patents. Zenith balked at amending its ANDA, however, because Abbott then could institute another infringement suit and trigger a new 30–month stay of FDA approval (absent an intervening judicial determination of non-infringement) of Zenith's proposed generic tablet. On April 15, 1996, Zenith sued Abbott for improperly listing the '095 and '207 patents, and requested injunctive relief delisting them from the Orange Book. Abbott counterclaimed, alleging that Zenith had infringed those patents.

Later that month, on April 29, 1996, Geneva renewed its drive to market the first generic tablet and capsule versions of Hytrin by filing an ANDA featuring a new paragraph IV certification with respect to Abbott's recently-listed '207 patent. Abbott launched an infringement action to stop Geneva's new generic tablet proposal, but inexplicably failed to protest Geneva's new generic capsule proposal. FDA con-

tinued to evaluate the safety and efficacy of Geneva's proposed capsule while the automatic 30–month stay for approval of Geneva's proposed tablet took effect.

## 2. The Survival of the "Successful Defense" Requirement

In 1997, two federal courts rendered conflicting decisions on the validity of the successful defense requirement, temporarily throwing into question which drug maker would market the first generic version of Hytrin. On January 23rd, the United States District Court for the District of Columbia strongly questioned the validity of the successful defense regulation and concluded that the first drug maker to file an ANDA for a generic micronized glyburide product, Mova Pharmaceutical Corp., was entitled to exclusive marketing rights to that product for 180 days despite the fact that one of its competitors, Mylan Pharmaceuticals, Inc., filed a micronized glyburide ANDA later and successfully defended it first. *Mova Pharm. Corp. v. Shalala*, 955 F.Supp. 128, 131–32 (D.D.C. 1997); *id* at 130 (enjoining FDA from enforcing regulation against plaintiff because underlying statute "does not include a 'successful defense' requirement"). FDA briefly ceased enforcing its regulation "in order to promote administrative uniformity and to avoid [judicial] forum shopping problems," but on July 3rd, Judge Boyle of the United States District Court for the Eastern District of North Carolina upheld the validity of the successful defense regulation and enjoined FDA from *refusing* to enforce it. *See Granutec, Inc. v. Shalala*, 1998 WL 153410, at *1 (4th Cir. Apr.3, 1998) (recounting history of unreported District Court case). The Court of Appeals for the Fourth Circuit promptly stayed this injunction pending appeal. *Id.* at *5.

On November 5, 1997, FDA announced that it would enforce the successful de-

fense regulation and await the decision of the appellate courts before revising its standards. Policy on 180–Day Marketing Exclusivity for Drugs Marketed under Abbreviated New Drug Applications; Clarification, 62 Fed.Reg. 63,268, 63,269 (Nov. 28, 1997). Thus, despite the decision of the United States District Court for the District of Columbia in the *Mova* case, Geneva would have to successfully defend its ANDA against Abbott's infringement suit before Zenith successfully defended its ANDA in order to market the first generic version of Hytrin.

While *Mova* and *Granutec* were pending before the federal Courts of Appeal, Zenith's campaign to beat Geneva to the market also suffered a setback. On October 1, 1997, the United States District Court for the District of New Jersey rejected Zenith's complaint for injunctive relief to delist Abbott's '095 and '207 patents, at least temporarily blocking final FDA approval of Zenith's ANDA. *See Zenith Labs., Inc. v. Abbott Labs.*, Civ. No. 96–1661, slip. op. at 26–27 (D.N.J. Oct. 1, 1997). Zenith appealed this decision to the Court of Appeals for the Federal Circuit. Then, on February 27, 1998, Zenith asked FDA to develop "a plan of action . . . to expedite final approval of Zenith's ANDA upon the delisting of Abbott's patents," so Zenith could "immediately bring [its] product to market should [it] receive a favorable court ruling." (Walgreen Pls.' Opp'n, Nov. 8, 1999, Ex. 3 (Letter from Jason A. Gross, Director, Zenith Regulatory Affairs, to Douglas L. Sporn, Director, FDA Office of Generic Drugs (Feb. 27, 1998) (previously filed under seal)).)

In late March, 1998, both Geneva and Zenith were poised to market generic versions of Hytrin in the United States. Geneva received final FDA approval for its generic capsule in March subject to "validation,"[4] and the 30–month stay on its

---

4. "Validation" refers to the process by which      a drug maker produces three commercial-size

generic tablet proposal was set to expire in October. Zenith declared that it was ready to market a generic tablet upon receipt of a favorable decision from the Federal Circuit and final FDA approval.[5] But competition between Abbott, Geneva, and Zenith for the United States market for sales of terazosin hydrochloride drugs did not materialize.

### 3. Abbott's Accords with Zenith and Geneva

Abbott and Zenith informed the Federal Circuit on March 20, 1998, that they were settling their dispute and asked the Court to hold Zenith's appeal in abeyance. Then, on March 30th, Abbott received word that FDA had approved Geneva's generic terazosin hydrochloride capsule. During the following two days, Abbott entered into separate confidential agreements with Zenith and Geneva to alter each company's rights and responsibilities.

Under its March 31, 1998, "Settlement Agreement," Zenith agreed to accept $3 million to join Abbott in dismissing the disputes before the District of New Jersey and the Federal Circuit, and to accept an additional $6 million per quarter (or a prorated sum for a shorter period) to "not

sell, offer for sale, donate, or otherwise commercially distribute in the United States any [t]erazosin [h]ydrochloride [p]roduct" until another drug maker sold a generic version of Hytrin in the United States, Abbott elected to "allow[ ] Zenith to enter the market," or Abbott's patents expired. (*See* Pl.'s Mem., Feb. 18, 2000, Ex. 1, at 2, 3, 5 (Zenith–Abbott Agreement (Mar. 31, 1998)) ["Zenith Agreement" or "Z.A."].)[6] Zenith also promised "not [to] aid or assist any person or entity to gain FDA approval to market a[t]erazosin [h]ydrochloride [p]roduct," and obtained Abbott's permission to market such products once generic competition began. (*Id.* at 7, 4.)

On April 1, 1998, Geneva agreed to accept $4.5 million per month from Abbott (or a prorated sum for a shorter period) to refrain from marketing any generic terazosin hydrochloride drug, including its FDA-approved capsule, until another drug maker sold a generic version of Hytrin in the United States or Geneva received a final, unappealable judgment that its proposed generic tablet did not infringe Abbott's patents. (*See* Pl.'s Mem., Ex. 2, at 2–5 (Geneva–Abbott Agreement (Apr. 1, 1998)) ["Geneva Agreement" or "G.A."].)[7] Geneva

---

batches of the approved drug to prove that its product meets the technical specifications contained in the relevant ANDA. *See* FOOD & DRUG ADMIN., GUIDELINE ON GENERAL PRINCIPLES OF PROCESS VALIDATION (1987), *reprinted in* Geneva Opp'n, Ex. 3–A, Mar. 21, 2000; *see also* 21 C.F.R. § 211.110; (Geneva Opp'n, Ex. 3, at 3 (Aff. of Joan Fiore, Geneva Project Manager)).

5. (*See* Walgreen Pls.' Opp'n, Ex. 4 (Declaration of Karen Rocco, Associate Director, Zenith Regulatory Affairs, at ¶ 5).) According to the defendants, by filing the first ANDA on Abbott's patents, Geneva precluded Zenith from introducing the first generic version of Hytrin. (*E.g.*, Abbott Statement, Mar. 20, 2000, at 14.) This statement draws a legal conclusion and conflicts with the state of the law at the time of the defendants' agreements. *See infra* note 12 and accompanying text.

6. Zenith would receive only $3 million for the first quarter that it refrained from marketing a generic version of Hytrin, (*id.* at 3), but if Geneva ultimately enjoyed exclusive marketing rights by statute for 180 days, Abbott would pay Zenith three million dollars during that period as well. (*Id.* at 4.)

7. Abbott reserved the right to suspend its payments to Geneva, promising "not to sue it for patent infringement ... of the '207 patent," if no drug maker introduced a generic version of Hytrin by February 18, 2000. (*Id.* at 4.) For its part, Geneva promised "to use its best efforts to oppose any attempts by any ANDA applicant that is a party to litigation involving terazosin hydrochloride patents to assert that it is entitled to approval of its ANDA ... prior to the date currently determined pursuant to 21 C.F.R. § 314.107." (*Id.* at 5.)

and Abbott agreed to continue their court battle over the proposed generic terazosin hydrochloride tablet. Geneva promised to "join and support any motion filed by Abbott ... in the Northern District of Illinois" seeking an extension of FDA's 30–month stay on approval of its proposed tablet. (*Id.* at 5.) If Geneva successfully defended Abbott's suit before the trial court, Abbott would pay subsequent monthly payments into an escrow fund payable to the final prevailing party on appeal, whether before the Federal Circuit or the Supreme Court. Geneva also pledged not to transfer the rights to its ANDAs or the FDA-approved capsule. If Abbott elected to terminate its payments in February, 2000, Geneva would enjoy the right to market terazosin hydrochloride products in the United States without objection. (*Id.* at 4.)

On April 2, 1998, and for the following sixteen months, Abbott sold the only terazosin hydrochloride drug available in the United States.

## DISCUSSION

As previously mentioned, the Sherman Act Plaintiffs seek a partial summary judgment that the defendants committed a *per se* violation of section one of the Sherman Act by contracting to allocate the United States market for terazosin hydrochloride products, thereby stifling domestic competition and restricting the output and sale of generic versions of Hytrin.

The defendants counter that the challenged agreements tended to foster competition, imposed only incidental restraints on generic drug production mirroring those imposed by law, and caused no harm to the plaintiffs. Zenith, in particular, relies on these arguments and others to establish that it is entitled to summary judgment on the plaintiffs' complaints. Leaving aside the defendants' assertions regarding causation and damages until the parties have had a full opportunity to conduct discovery,[8] the Court will examine the parties' contentions *seriatim.*

### 1. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED. R. CIV. P. 56(e)). Accepting this evidence as truthful, the Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether " 'the evidence pres-

---

8. On February 14, 2000, the Court stayed all discovery unrelated to class issues until the parties' cross-motions for summary judgment were fully briefed and resolved. Since the parties have not conducted full discovery on the issues of causation and damages, those questions presently are not ripe for summary judgment.

Zenith protests that *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), bars this tribunal from considering whether the defendants

committed a *per se* violation of the Sherman Act until the plaintiffs prove that they have suffered an "antitrust injury" under the Clayton Antitrust Act, 15 U.S.C. §§ 12–37(a). As the Supreme Court observed in that case, however, "proof of a *per se* violation and of antitrust injury are distinct matters that must be shown independently." 495 U.S. at 344, 110 S.Ct. 1884 (citation omitted). Accordingly, today's decision draws no conclusion regarding whether the plaintiffs have suffered an antitrust injury.

ents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505).

### 2. The Sherman Antitrust Act and Illegality *Per Se*

■ Congress designed the Sherman Antitrust Act of 1890 as a "consumer welfare prescription" to protect free enterprise and competition. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (citation omitted). Although section one of the Sherman Act literally bans every agreement "in restraint of trade," 15 U.S.C. § 1, this provision has been interpreted to prohibit only those contracts involving interstate commerce that "unreasonably" restrain competition. *Standard Oil Co. v. United States*, 221 U.S. 1, 55–60, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Applying the "rule of reason," courts conduct an extensive and complex investigation into "the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption" to determine whether the challenged contract unreasonably restrains competition. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (citation omitted). Only blatantly anti-competitive agreements that predictably "tend to restrict competition and decrease output" may be condemned as unreasonable and illegal *per se* "without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Broadcast Music, Inc. v. Columbia Broad. Sys.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (Black, J.).

### 3. The Challenged Accords are Illegal *Per Se*

"[W]hether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *NCAA v. Board of Regents*, 468 U.S. 85, 103, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (footnote omitted); *see also* 7 Phillip E. Areeda, Antitrust Law ¶ 1503a, at 372 (1986) ("Every antitrust suit should begin by identifying the ways in which a challenged restraint might possibly impair competition."). The defendants' agreements contain numerous covenants inimical to free enterprise.

In its agreement with Abbott, Geneva promised to withhold its FDA-approved capsule from the United States market, to refrain from selling its rights to that capsule and its tablet ANDAs, to oppose any attempts by other ANDA applicants to enter the market early, and, in the event that Geneva "successfully defended" its tablet ANDA before the Federal Circuit and secured a 180–day exclusivity period, to forgo marketing that tablet until Abbott exhausted any appeals before the Supreme Court. *See supra* pages 1346–47. Similarly, in its accord with Abbott, Zenith agreed to dismiss its efforts to delist Abbott's Hytrin patents, to rebuff other entities' requests for help in challenging those patents, and, with the assurance of continued payment during any period of exclusivity enjoyed by a rival generic drug maker, to refrain from marketing the first generic terazosin hydrochloride product unless Abbott authorized Zenith to enter the market, or Abbott's patents elapsed. *See supra* pages 1345–46.

Viewed together and in their factual context, these provisions illustrate that Geneva and Zenith forswore competing with Abbott in the United States market for

terazosin hydrochloride drugs and promised to take steps to forestall others from entering that market for the life of their respective agreements in exchange for millions of dollars in monthly or quarterly payments. Geneva and Zenith were poised to compete with Abbott at the same level of the market; Geneva had received final FDA approval for its capsule pending validation and Zenith anticipated a favorable ruling that would result in final approval of its tablet proposal. Prices were likely to fall as the output of terazosin hydrochloride drugs climbed. *See generally* 11 HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1902a, at 191 (1998) ["HOVENKAMP"] (noting that horizontal agreements "enable participants to reduce the output of goods in some market, thus causing higher prices, inefficient substitutions, and the resultant losses in consumer welfare"). Instead of braving the rigors of competition, or unilaterally avoiding the arena, Geneva and Zenith both made pacts with Abbott to "enhance their collective profits to the detriment of consumers."[9] Abbott dissuaded Geneva and Zenith from marketing the first generic terazosin hydrochloride drugs in the United States for an indefinite period, eliminated the risk that either drug maker would sell or purchase the right to introduce such drugs in the interim, and enlisted their potential cooperation in opposing or refusing to support other drug makers' ANDAs. This scheme of agreements clearly "den[ied] to consumers the opportunity to choose among alternative offers without offering the possibility of any joint, efficiency-producing activities."

*See United States v. Realty Multi–List, Inc.*, 629 F.2d 1351, 1364 (5th Cir.1980) (citation omitted).[10] Under this scheme, the defendants would earn their profits by limiting marketwide output and maintaining a higher price for Abbott's product.

Abbott's agreements with Geneva and Zenith to forestall competition in the United States for sales of terazosin hydrochloride drugs confront the Court with "[o]ne of the classic examples of a *per se* violation"—"an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *Topco Assocs., Inc.*, 405 U.S. at 608, 92 S.Ct. 1126.

> Such concerted action is usually termed a "horizontal" restraint, in contradistinction to combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors, which are termed "vertical" restraints. This Court has reiterated time and time again that "[h]orizontal territorial limitations ... are naked restraints of trade with no purpose except stifling of competition." Such limitations are *per se* violations of the Sherman Act.

*Id.* (citations omitted); *see also id.* at 613, 92 S.Ct. 1126 (Burger, C.J., dissenting) (observing that *per se* rule rightly condemns horizontal agreements "involv[ing] restraints on interbrand competition or an allocation of markets by [an entity or group] with monopoly or near-monopoly control of the sources of supply"). *See generally* HOVENKAMP, *supra* page 11,

---

**9.** 7 PHILLIP E. AREEDA, ANTITRUST LAW ¶ 1503a, at 374; *see Palmer v. BRG*, 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam) (observing that plaintiff need not prove that defendants previously competed in relevant market to establish *per se* violation of 15 U.S.C. § 1); In re *Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618, 677–79 (E.D.Mich. 2000) ["*Cardizem I*"] (same). These agreements did not deprive Geneva or Zenith of the opportunity to sell terazosin hydrochloride drugs outside the United States.

**10.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions that the former Court of Appeals for the Fifth Circuit rendered before October 1, 1981.

¶ 1902a, at 190 ("Horizontal agreements are antitrust's most 'suspect' classification.").

When presented with a plainly anti-competitive contract, the Court "need not then inquire whether the [defendants] actually possess the power to inflict public injury," or whether "the restraint ... is justified by any procompetitive purpose or effect." *Realty Multi–List,* 629 F.2d at 1362. Nevertheless, this tribunal will examine the defendants' chief mitigating arguments, mindful that "[t]he probability that anti-competitive consequences will result from a practice ... must be balanced against its pro-competitive consequences," *Arizona v. Maricopa County Med. Soc.,* 457 U.S. 332, 350 n. 16, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), and that the defendants must "come forward with 'specific facts showing that there is a genuine issue for trial' " on the potential consequences of their accords. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

### 4. The Defenses Offered by Defendants are Invalid

The defendants claim immunity from the *per se* rule on several grounds. First, they contend that the challenged agreements tended to foster competition or had no impact on their ability to compete. Second, they argue that the agreements are beyond the scope of the *per se* rule because they were novel, analogous to patent settlements, or designed to influence government organizations. These arguments are not persuasive, and the defendants' evidence does not establish a genuine issue for trial.

#### A. Economic Justifications for Challenged Accords

#### 1. Pro–Competitive Motives or Provisions

■ The defendants maintain that their agreements would have tended to advance competition by ending or preventing fractious patent disputes and eliminating obstacles to Geneva and Zenith's entrance into the United States market for terazosin hydrochloride products. Of course, the Supreme Court "has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition." *Topco Assocs., Inc.,* 405 U.S. at 610, 92 S.Ct. 1126 (citations omitted). Viewed in the light most favorable to the defendants, however, the record does not substantiate that the Geneva and Zenith Agreements were reasonably ancillary to pro-competitive activity rather than unreasonable restraints of trade.

The Geneva Agreement did not enhance competition. According to the defendants, Geneva contracted with Abbott to avoid "substantial legal and financial risks" accompanying the introduction of its capsule product, furthering "the public policy preference for deferring generic entry until after the resolution of any patent dispute with respect to any given drug." (Abbott Statement at 7 (citations omitted); *id.* at 13 (citing Decl. of Steven N. Wiggins, Econ. Professor, Texas A & M Univ., at ¶¶ 14–22, 32–48).) Accepting these allegations as true, it is readily apparent that Geneva did *not* have to enter into a contract with Abbott in order to defer its entry into the United States market.

Abbott's confidential agreement with Geneva did not resolve its action before the Northern District of Illinois; in fact, it tended to prolong that dispute to Abbott's advantage. Geneva agreed to accept over a million dollars per week to refrain from marketing any generic terazosin hydrochloride product until another drug maker sold a generic version of Hytrin in the United States, or it received an unappealable judgment that its proposed generic

tablet did not infringe Abbott's patents. (G.A. at 3–5.) The latter condition restrained Geneva from marketing its products during the pendency of any Supreme Court review, even if Geneva obtained a favorable ruling from the Federal Circuit in satisfaction of FDA's successful defense requirement. This design did not enhance competition.[11]

Geneva would have been able to market terazosin hydrochloride products in the United States without objection if Abbott elected to end its payments, (G.A. at 4), but this clause cannot justify the defendants' comprehensive and unreasonable restraints. One could reasonably infer that this clause was a catalyst for competition if Geneva paid Abbott for it, but the suggestion that Abbott handsomely paid Geneva to spur competition in its own lucrative domestic market for terazosin hydrochloride products is patently unreasonable. See In re Cardizem CD Antitrust Litig., 105 F.Supp.2d 682, 699 (E.D.Mich.2000) ["Cardizem II"] (concluding that drug makers' alleged agreement to allocate United States market for brand-name drug Cardizem CD provided "an incentive to stay off the market"); Cardizem I, 105 F.Supp.2d at 679 (noting that defendant "ignore[d] the reasonable inference that HMRI would not have paid Andrx millions of dollars to stay off the market beyond July 9, 1998, if it was not reasonably probable that Andrx would enter the market"). The Geneva Agreement clearly sought to curtail the domestic sale of generic terazosin hydrochloride drugs.

The Zenith Agreement also sought to restrain domestic competition. Zenith confidentially agreed to terminate its poten-

tially meritorious challenge to Abbott's Hytrin patents in the District of New Jersey and the Federal Circuit in exchange for three million dollars. Thereafter, in a separate series of transactions, Zenith would receive millions of dollars to "not sell, offer for sale, donate, or otherwise commercially distribute in the United States any [t]erazosin [h]ydrochloride [p]roduct" until another drug maker sold a generic version of Hytrin in the United States, among other things. (Z.A. at 3.) Zenith also promised "not [to] aid or assist any person or entity to gain FDA approval to market a[t]erazosin [h]ydrochloride [p]roduct," but once generic competition began, Zenith could market such products in the United States without objection from Abbott. (Id. at 6.) The Zenith Agreement would indefinitely postpone Zenith's entry into the United States market and would permit competition only once Abbott lost its exclusive market. Like its agreement with Geneva, Abbott's agreement with Zenith resulted in a cooperative effort to forestall competition, not to enhance it.

### 2. Ineffective Restraints

Next, the defendants contend that their agreements could not unreasonably restrain the domestic market for terazosin hydrochloride products because Geneva was unable to validate its capsule product and legally enter the market until August, 1999, and Zenith was subject to Geneva's 180–day period of exclusivity on March 31, 1998. Although the Court accepts the defendants' allegations of fact as true for purposes of resolving the plaintiffs' motion for partial summary judgment, Allen, 121

---

11. See 59 Fed.Reg. at 50,354 ("The likelihood of an appellate court decision being heard and overruled by the Supreme Court is too remote to warrant delaying marketing and exclusivity pending resolution of a petition for writ of certiorari."). Further, Geneva also promised to "join and support any motion filed by Abbott ... in the Northern District of Illinois" seeking an extension of FDA's 30–month stay on approval of its proposed tablet, potentially delaying the proceedings even further. (G.A. at 5.)

F.3d at 646, the contention that Zenith could not enter the market in March, 1998, draws a legal conclusion and must be disregarded by the Court under FED. R. CIV. P. 56(e).[12] Indeed, the defendants' allegations are irrelevant, for it is well-settled that

> conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. It is the 'contract, combination ... or conspiracy, in restraint of trade or commerce' which § 1 of the Act strikes down, *whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other.*

*United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (citations omitted and emphasis added); *see Maricopa County Med. Soc.,* 457 U.S. at 345, 102 S.Ct. 2466 (following *Socony–Vacuum Oil Co.* decision); *see also* AMERICAN BAR ASS'N, ANTITRUST LAW DEVELOPMENTS 79 (4th ed.1997).

### B. Similarity of Accords to Contracts Beyond the Scope of the *Per Se* Rule

Having failed to identify a genuine issue of fact concerning the anti-competitive potential of their agreements to allocate the United States market for terazosin hydrochloride products to Abbott, the defendants attempt to redraw their accords as novel compacts, patent settlements, or petitions not subject to the *per se* rule. These efforts are also unpersuasive.

#### 1. Novel Agreements

■ Zenith, Geneva, and Abbott assert that the impact of their agreements "is not immediately obvious" because the judiciary lacks experience with "agreement[s] between brand[ed] and generic drug manufacturers ... to settle novel delisting claims and patent litigation and [to] speed introduction of the generic ... product into the market." (Zenith Opp'n at 12; *see* Geneva Opp'n, Mar. 21, 2000, at 8 ("[n]ot a single court has evaluated whether agreements such as these ... are anticompetitive"); Abbott Opp'n, Mar. 20, 2000, at 20.) This assertion is incorrect. American courts have extensive experience with horizontal market allocation agreements and their foreseeable anti-competitive effects.

Without belaboring the point, the undisputed record and the plain text of Abbott's agreements with Geneva and Zenith bespeak the defendants' intent to eliminate domestic competition for sales of terazosin hydrochloride products in the short run and delay the onset of generic competition. Such horizontal agreements to allocate territories remain illegal *per se* under section one of the Sherman Act even if they involve complex disputes involving pharmaceutical companies. *See Maricopa County Med. Soc.,* 457 U.S. at 349, 102 S.Ct. 2466 (rejecting argument that Supreme Court "should not apply the *per se* rule in this case because the judiciary has little antitrust experience in the health care industry"); *Cardizem II,* 105 F.Supp.2d at 705–06 (declaring defendants' horizontal market allocation agreement illegal *per se*); *Cardizem I,* 105 F.Supp.2d at 676–77 (rejecting "novelty" arguments raised by drug makers HMRI and Andrx to dismiss consolidated Sherman Act challenges). Certainly, the *per se* rule must be "applied

---

12. (*E.g.,* Zenith Opp'n, Mar. 20, 2000, at 5 (drawing legal conclusion)); *see Beard v. Annis,* 730 F.2d 741, 743 (11th Cir.1984) (rejecting statements of law as inadmissible); 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738, at 346–56 (1998). The defendants' legal allegation pointedly ignores FDA's November 5, 1997, pronouncement that the agency would continue to enforce the successful defense regulation. (*See* Walgreen Pls.' Reply to Zenith, Apr. 3, 2000, at 2.) That was the state of the law on March 31, 1998.

infrequently and with caution" to avoid "mislabeling procompetitive activity as *per se* illegal," *Seagood Trading Corp. v. Jerrico*, 924 F.2d 1555, 1567 (11th Cir.1991), but the rule need not "be rejustified for every industry that has not been subject to significant antitrust litigation." *See Maricopa County Med. Soc.*, 457 U.S. at 350–51, 102 S.Ct. 2466. The Sherman Act "establishes one uniform rule applicable to all industries alike." *Socony–Vacuum Oil Co.*, 310 U.S. at 222, 60 S.Ct. 811. Contrary to the defendants' assertions, this case does not involve "the 'mere attachment of a *per se* label ... to defendants' conduct,'" or an attempt to "'throw labels ... around loosely.'" (Zenith Opp'n at 13 (citation omitted).) The defendants' confidential and comprehensive allocation of the United States market for the sale of terazosin hydrochloride products should be denounced under the *per se* rule.

## 2. Patent Settlements

Zenith and Abbott claim that the challenged accords are analogous to patent settlement agreements and that the *per se* rule does not apply to such settlements. (Zenith Opp'n at 12; Abbott Opp'n at 26–27 ("antitrust cases considering settlements of patent ... disputes are consistently evaluated under the rule of reason").) Again, the defendants are mistaken. Abbott's agreement with Geneva did not resolve its infringement suit in the Northern District of Illinois, and while Zenith agreed to dismiss its appeal before the Federal Circuit in exchange for three million dollars, this exchange was part of a larger scheme to restrain the domestic sale of generic terazosin hydrochloride products. Furthermore, the Supreme Court has reviewed patent settlements under the *per se* rule. *E.g.*, *United States v. New Wrinkle, Inc.*, 342 U.S. 371, 377, 72 S.Ct. 350, 96 L.Ed. 417 (1952). The *per se* rule applies to the defendants' conduct.

## 3. Efforts to Influence Government Action

Lastly, Abbott seeks the shelter of the *Noerr–Pennington* doctrine, which shields legitimate efforts to influence public officials from potential antitrust liability. (*See* Abbott Opp'n at 27–29) (citing *McGuire Oil Co. v. Mapco*, 958 F.2d 1552, 1560 (11th Cir.1992).) *See generally California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 137–38, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The *Noerr–Pennington* doctrine "protect[s] those acts reasonably and normally attendant upon effective litigation," including threats of suit, and demand letters, *Mapco*, 958 F.2d at 1560 (citation omitted), but does not condone contracts bearing a "resemblance to the combinations normally held violative of the Sherman Act, [including] ... market-division agreements." *Noerr Motor Freight*, 365 U.S. at 134–35, 81 S.Ct. at 528; *see Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). Consequently, the challenged agreements are not entitled to refuge under this doctrine.

Abbott's confidential agreements with Geneva and Zenith were not legitimate efforts to influence public officials; rather, they implemented the defendants' scheme to restrain the domestic sale of generic terazosin hydrochloride products without government scrutiny. *Noerr–Pennington* immunity does not apply to restraints adopted by private entities; it extends only when "the alleged restraint of trade [is] the intended consequence of public action." *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424–25, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Further,

clandestine restraints of trade are not "normally attendant upon" patent litigation. Contrary to Abbott's assertion, the Court of Appeals' *Mapco* decision does not "flatly contradict [that] position," or hold that price-fixing stipulations adopted by opposing parties in ongoing litigation are entitled to *Noerr–Pennington* immunity. *See Mapco,* 958 F.2d at 1561–62 (rejecting defendant's narrow argument that plaintiffs' "concerted threats [of suit] and institution of litigation ... violated the Sherman Act"). Abbott's efforts to parlay its patents into agreements with its competitors to limit the domestic sale of generic terazosin hydrochloride drugs is exactly "the type of commercial activity that has traditionally had its validity determined by the antitrust laws." *Allied Tube & Conduit Corp.,* 486 U.S. at 505, 108 S.Ct. 1931.

## CONCLUSION

Both the Geneva Agreement and the Zenith Agreement warrant condemnation as *per se* violations of section one of the Sherman Antitrust Act. This tribunal's extensive review of the undisputed record has validated the presumption that the defendants' horizontal market allocation agreements would tend to inhibit domestic output and price competition without creating efficiencies for American consumers, and the defendants have not adduced sufficient facts to place the illegality of their restraints in genuine dispute. Therefore, for the reasons stated in the foregoing opinion, it is hereby

ORDERED that the Sherman Act Plaintiffs' motion for partial summary judgment [D.E. No. 21, Civ. No. 99–MDL–1317] is GRANTED, and it is

ORDERED that defendant Zenith Goldline Pharmaceuticals, Inc.'s motion for summary judgment [D.E. No. 77, Civ. No. 98–3125; D.E. No. 45, Civ. No. 99–1938] is DENIED without prejudice to its arguments regarding causation and damages, which may be renewed at the close of Phase II discovery.